

Karen E. Keller
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-070
(302) 298-0702 – Direct
kkeller@shawkeller.com

October 7, 2022

**BY CM/ECF & HAND DELIVERY**
The Honorable Gregory B. Williams
United States District Court
844 N. King Street
Wilmington, DE 19801

      Re:    *CMC Materials, Inc. v. Dupont De Nemours, Inc.*, *et al.,* C.A. No. 20-738-GBW

Dear Judge Williams:

      The parties respectfully submit this letter regarding the parties' remaining disputes concerning the proposed scheduling order, a copy of which, identifying the parties' competing positions, is attached as Ex. A.

      The parties met and conferred on Monday, October 3, 2022, from 11:00 a.m. to 11:30 a.m. to discuss any remaining disputes, particularly in view of Plaintiff's compromise positions. The meet and confer occurred virtually via Microsoft Teams.  Local and lead counsel for all parties were present.  Specifically, for Plaintiff, the participants were: John Shaw (local lead); Robert Scheinfeld (lead); and Katharine Burke.  For Defendants, the participants were: David Moore (local lead); Charlie Lipsey (lead); Eric Fues; Paul Townsend; Bindu Palapura; and Carson Bartlett.

      The parties have resolved their disputes concerning the proposed protective order but were unable to resolve the remaining disputes regarding the scheduling order.  The sections that follow identify those disputes that need the Court's attention, including by the specific paragraph number where the dispute appears, and provide the parties' position on each such dispute.

      1.    CMC's Positions Concerning the Proposed Scheduling Order Disputes

The parties' disputes relate to two primary issues: (1) the overall case schedule; and (2) certain issues relating to the scope of discovery and contentions.

      (a)    **Schedule**

The parties dispute the following deadlines in the proposed scheduling order (Ex. A).  The key dispute is the trial date.  When that is set, the remaining dates should also be resolved.

- Paragraphs 3(c)-(g) and 12: Dates for contentions;

- Paragraphs 4(a), (b), (f)(i), and (f)(iii): Dates for fact and expert discovery;

- Paragraphs 8-10: Dates for claim construction;

- Paragraph 11: Date for counsel to submit an interim status report to the court;

SHAW KELLER LLP
Page 2

- Paragraph 13(a): Dates for case dispositive motions;

- Paragraph 19: Dates for a pretrial conference; and

- Paragraph 21: Dates for trial.

**Plaintiff's Position:** The parties have already extensively litigated the patent issues in this case at the International Trade Commission ("ITC"), culminating in the ITC's final decision, after an evidentiary hearing, finding infringement by Defendants of the patent claims asserted herein, and issuing an exclusion order, and cease and desist orders, enjoining the same accused products.[1] Indeed, Plaintiff proposes a schedule that reflects the parties' prior litigation at the ITC on identical patent issues, and that incorporates numerous compromise positions attempting to streamline disputes and close the 1-year gap between the parties' original proposals. Ex. A.

In the ITC Investigation, No. 337-TA-1204 (the "1204 Investigation"), Plaintiff asserted the same patent and same claims against the same Defendants and same accused products based on the same evidence. While the decision in the 1204 Investigation is not binding on this Court, the 1204 Investigation included voluminous discovery that can be used in this proceeding, including the production of over 185,000 pages of documents, responses to 195 interrogatories, 25 depositions, and 5 technical experts with full reports and testimony at trial. As Plaintiff informed Defendants months ago, Plaintiff will rely on the same infringement contentions and claim constructions here. For their part, Defendants have not identified any new or different prior art or invalidity positions than what they already asserted in the 1204 Investigation; in fact, their invalidity and inequitable conduct counterclaims just repeat the contentions that the ITC has already rejected.

Plaintiff has also taken significant steps to reach agreement on the schedule. Plaintiff's compromises either fully accept Defendants' original proposals or otherwise came closer to Defendants' original proposed deadlines by approximately 3 months or longer. Ex. A at pp.18-21. Defendants in turn have maintained and even extended many of their original proposals, as made clear at the chart attached to the end of the proposed scheduling order. *See id.* Plaintiff now proposes trial in May 2024, about two years from the Amended Complaint, and Defendants propose trial in March 2025, nearly three years from the Amended Complaint.

Plaintiff respectfully submits that there is no reason for Defendants' unusually prolonged schedule. Defendants assert that their new antitrust counterclaims (which Plaintiff has moved to

---

[1] Defendants still refuse to allow this Court or CMC's non-ITC counsel access to the ITC's 331-page unredacted decision, presumably on the ground that such disclosure poses a risk to its confidential information before issuance of a protective order in this matter. D.I. 70 at 6 n.2. DuPont's position, however, directly defies this Court's order that the ITC record shall be handled "as confidential pursuant to Delaware Local Rule 26.2, pending entry of a superseding protective order by this Court." D.I. 38. To the extent DuPont believes that the ITC Protective Order provides no "mechanism" for such disclosure, that is wrong, as the ITC Protective Order expressly allows for disclosure with "written permission from the supplier." D.I. 73, Ex. A ¶ 3. CMC has provided that permission; Defendants refuse to do so.

**SHAW KELLER LLP**
Page 3

dismiss) justifies the extended timing.  But these counterclaims are all purportedly related to agreements, documents, and communications that Plaintiff produced to Defendants years ago.  And, in any event, Plaintiff's proposed schedule is more than sufficient for any new discovery relating to Defendants' counterclaims, including productions and depositions from any potentially new document custodians of Plaintiff and third parties.

Defendants also contend their proposed, nearly three-year schedule is necessary to obtain additional discovery from a third-party in Japan, Fuso Chemical ("Fuso"), regarding Fuso's communications with Plaintiff and the inventors of the asserted patent, which purportedly relate to Defendants' antitrust, inequitable conduct, and invalidity counterclaims.  But, not only is it far from certain that Defendants can obtain discovery from an entity based in Japan,[2] Defendants' counterclaims related to Fuso also are largely duplicative of many of the issues the parties already extensively litigated in the 1204 Investigation.  Defendants have not identified a single document that they believe Fuso has that Plaintiff has not already produced—including in the over 20,000 emails and attachments from the inventors, and the over 5,000 documents, agreements, communications, and sales information relating to and referencing Fuso (see also D.I. 29).  Moreover, Defendants themselves estimate that discovery from an entity in Japan, to the extent provided at all and to the extent not duplicative of the current discovery in Defendants' possession, would take 6-12 months—leaving months before Plaintiff's proposed May 2024 trial date for the parties to address it, as needed.

Finally, Defendants contend that Plaintiff should just accept a delay in trial because Plaintiff is not seeking an injunction (having obtained one at the ITC) and Defendants purportedly no longer make or sell the infringing products.  This, however, ignores the mandate of Federal Rule of Civil Procedure 1 "to secure the just, speedy, and inexpensive determination of every action and proceeding" and the fact that the parties have already spent millions of dollars on extensive discovery, and that Plaintiff has been significantly harmed by Defendants' years of willful infringement, as the ITC already found.  Plaintiff respectfully submits that hypothetical, potential discovery from a third-party fails to justify further prolonged delay and multiplied litigation expense in compensating Plaintiff for its damages.

**Defendants' Position:** Contrary to Plaintiff's implication, Defendants have repeatedly endeavored to compromise with Plaintiff on a schedule that will accommodate the necessary discovery.  Like Plaintiff, Defendants had initially proposed moving by approximately 2-3 months most dates proposed to Judge Noreika on July 26, 2022 (D.I. 55), which already reflected numerous compromises with Plaintiff.  In a further effort to reach a compromise, Defendants have now proposed retaining the prior trial date and *shortening* the discovery period.  Defendants' proposal of just over a year for fact discovery is cognizant of the expected time of 6-12 months for obtaining discovery in Japan through Letters Rogatory—discovery that has been impeded by Plaintiff's unnecessary objections to Defendants' pending motion (D.I. 25).

---

[2] *See, e.g.*, Ex. B, Soble & M. Tanabe, *Conducting Discovery in Japan: Depositions, Letter Rogatory, and Production of Documents*, THE CORPORATE COUNSELOR (Sept. 1, 2012), https://www.foley.com/-/media/files/insights/publications/2012/09/conducting-discovery-in-japan-depositions-letter-r/files/conducting-discovery-in-japan-depositions-letter-r/fileattachment/thecorporatecounselor9112.pdf.

SHAW KELLER LLP
Page 4

Defendants have also compromised and proposed 35 interrogatories for each party, covering both the patent and antitrust issues across nine claims and counterclaims. Despite these compromises, the parties disagree on the time and discovery needed to litigate this dispute: Defendants seek a realistic amount of time to obtain full and complete discovery relevant to all claims and defenses, including those newly-asserted, while Plaintiff seeks truncated discovery on an unnecessarily expedited schedule prejudicial to Defendants.

This case is different from the ITC investigation, and Defendants' defenses and counterclaims will require additional discovery. During the ITC investigation, Defendants were unable to obtain highly relevant discovery, including third-party discovery, from Japanese colloidal silica particle supplier Fuso Chemical Co., Ltd. Here, Defendants will seek discovery from third parties, including from Fuso (through Letters Rogatory) and entities located in the U.S. *See* D.I. 25, 28, 31 & 75-76. Moreover, many of Defendants' counterclaims, such as those relating to antitrust and unfair competition, were not even at issue in the ITC, and targeted discovery relating to such issues was not conducted. Also, at the ITC, Defendants only received email discovery from three of Plaintiff's custodians; by contrast, the District of Delaware Default Standard for Discovery for ESI requires disclosures from the 10 custodians most likely to have discoverable information. Other custodians at Plaintiff will have information relevant to Defendants' patent misuse, unfair competition and antitrust counterclaims. And with respect to patent issues, the ITC rulings are not binding on this Court. *See Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1564 (Fed. Cir. 1996) (citing *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 851 F.2d 342, 344 (Fed. Cir. 1988)).

In addition to being prejudicial to Defendants' efforts to obtain full and fair discovery, an accelerated schedule is unnecessary for Plaintiff. Defendants are now subject to an ITC exclusion order, and Plaintiff seeks no TRO or other preliminary relief.[3] Hence, Plaintiff's sought-after relief is based on alleged damages, and it faces no material harm under Defendants' proposed schedule. Conversely, Plaintiff's highly compressed schedule would severely prejudice Defendants by limiting discovery in support of their claims and defenses. For example, Plaintiff proposes completing fact discovery and requiring final supplementation of prior art references by April 21, 2023, even though Defendants' Letter Rogatory to Fuso may take longer than six and one-half months to complete. Plaintiff also asks this Court to arbitrarily restrict the number of prior art refences and prior art colloidal silica particles that Defendants can raise in their invalidity challenges. In contrast, Plaintiff asserts 28 claims from its patent, and Plaintiff illogically refuses to limit the number of asserted claims until ***after*** Defendants submit initial and

---

[3] Plaintiff's allegation in footnote 1 that Defendants are "defying" any Court order in improper. The referenced order was directed at granting Plaintiff's motion for "transmittal of the complete record of the proceedings before the U.S. International Trade Commission" in the 1204 Investigation. D.I. 38. The Order directed where the Commission record should be sent that provided that "[t]o the extent the Commission record contains confidential information, the parties are ordered to handle such information as confidential pursuant to Delaware Local Rule 26.2, pending entry of a superseding protective order by this Court." D.I. 38 (emphasis added). Notably, rather than obstruct this process, Defendants assented to Plaintiff's motion.

SHAW KELLER LLP
Page 5

final invalidity contentions. Unlike Plaintiff, Defendants' proposal includes reasonable, progressive narrowing of both Plaintiff's asserted claims and the number of prior art references.

### (b)  Scope of Discovery and Contentions

The parties dispute the following discovery limits:

- Paragraphs 3(c), (f): Process for reducing the asserted claims;

**Plaintiff's Position:** To streamline disputes, Plaintiff has agreed to a staged reduction of asserted claims, as Defendants propose. Under Plaintiff's compromise position, Plaintiff will identify 20 asserted claims within 1 week of receiving Defendants' initial invalidity contentions, and 15 asserted claims within 2 weeks of receiving Defendants' final invalidity contentions. Reducing claims after invalidity contentions is appropriate because, as Plaintiff has explained, it is relying on the same infringement contentions from the 1204 Investigation, while Defendants have not made the same commitment with regard to their invalidity contentions. Further reductions may also occur after the Court's claim construction and as the parties near trial.

Under Defendants' position, Plaintiff will identify only 10 asserted claims a month ***before*** Defendants serve any invalidity contentions, and only 5 asserted claims on the same day as receiving Defendants' final invalidity contentions, before any claim construction briefing or expert discovery even begins. Staging the reduction in this manner would force Plaintiff to narrow the claims significantly before understanding the full scope of Defendants' contentions, much less the Court's claim construction or the positions of the parties' experts. That proposal is both extremely prejudicial and not necessary, as Defendants have already submitted contentions in the 1204 Investigation on all 28 claims currently asserted, and it will not be unduly burdensome to provide invalidity contentions for 15 or 20 claims, including only two independent claims, here.

**Defendants' Position:** Plaintiff proposes to litigate an excessive number of claims, and it proposes doing so out of order. Defendants agree that Plaintiff should undergo a substantial reduction of claims. Plaintiff's proposal, however, fails to meaningfully reduce the claims. As Plaintiff has repeatedly explained, the parties have gone through the discovery and contentions process in the ITC (*see*, *e.g.*, Plaintiff's argument regarding paragraphs 3(d) & (f) below). And while additional discovery is needed for Defendants' claims and counterclaims, Plaintiff certainly has enough information to choose 10 claims for its initial infringement contentions and 5 claims for its final infringement contentions. Plaintiff has not explained how narrowing the claims as Defendants propose is prejudicial to it. Nor can it. Narrowing the claims to a reasonable number of claims, i.e., 10 for initial contentions and 5 for final contentions, is standard in patent litigation, as it allows for the Court and the parties to focus on the main issues in the case.

Defendants have also proposed that Plaintiff identify its asserted claims before Defendants provide their initial invalidity contentions. This is, once again, standard in patent infringement cases. Plaintiff's complaint that Defendants' "proposal is both extremely prejudicial and not necessary" is, quite simply, false. Plaintiff asks the Court to approve an extraordinarily inefficient process that would have Defendants provide invalidity contentions to all of Plaintiff's

asserted claims before Plaintiff chooses which claims it feels are best. Defendants' proposal removes this inefficiency by having the patentee first explain which claims it is asserting, allowing the Defendants to focus their efforts on the appropriate claims. For example, Plaintiff identified in its supposed initial infringement contentions each and every claim (28 in total) where it prevailed at the ITC. Plaintiff now seeks to have Defendants provide initial invalidity contentions on all 28 claims before, a week later, dropping almost half of those claims. Moreover, in the section immediately following this, Plaintiff argues that Defendants should be limited in their prior art references and invalidity theories, which would take place before Defendants even know which claims will be asserted. Plaintiff could withdraw certain claims after seeing the prior art references Defendants assert against those claims, thus rendering those prior art references unnecessary.

- Paragraphs 3(d), (f): Process for narrowing invalidity assertions;

**Plaintiff's Position:** In view of the extensive invalidity discovery that occurred in the 1204 Investigation, Plaintiff proposes that Defendants limit their invalidity case to 20 total prior art references and 20 total invalidity theories by initial invalidity contentions, and 15 total prior art references and 15 total invalidity theories by final invalidity contentions. Defendants propose similar limits of 20 total prior art references at initial invalidity contentions, and 10 total references at final contentions. The main difference is that Defendants exclude from these limits any "prior art particles or prior art uses," for which Defendants propose "no limitation." This exclusion renders any agreed limitation meaningless. Defendants have already taken extensive discovery on purported prior art particles and uses, as well as numerous invalidity theories relating to indefiniteness, written description, and enablement (all of which were thoroughly considered and rejected in the Administrative Law Judge's 331-page Initial Determination), and Defendants do not justify such unbounded contentions now.

**Defendants' Position:** Both parties have proposed narrowing the number of prior art references, but the dispute centers on prior are colloidal silica particles and prior art uses, mainly involving the use of those particles. Plaintiff fails to mention above that the particles at issue were provided by Fuso Chemical Company, to Plaintiff and/or Defendants, for use in CMP slurries. In addition, Defendants seek discovery to respond to any arguments that the properties of the Fuso particles could have changed over time. Defendants oppose a restriction on the number of prior art particles or their uses at this time, especially given Plaintiff's apparent arguments that particles that it purchased, sometimes in metric ton quantities, changed over time such that they would constitute different and distinguishable prior art. But Defendants would be willing to revisit this issue after the exchange time of expert reports.

Plaintiff also asserts that Defendants should be limited to 20 total invalidity theories because, in part, the Administrative Law Judge addressed Defendants' arguments. Plaintiff ignores, however, that ITC rulings are not binding before this Court. Defendants still view the '721 patent as having several invalidity issues, which they expect to raise again in this proceeding. Plaintiff chose to bring this litigation against Defendants. It cannot complain, as it does now, that Defendants' attempts to defend themselves are unjustified or should be arbitrarily and summarily limited.

SHAW KELLER LLP

Page 7

- Paragraphs 4(d)(i), (e)(i): Interrogatory and deposition limits

**Plaintiff's Proposal:** In the 1204 Investigation, the parties each served around 100 interrogatories and each took over 10 depositions, which Plaintiff proposes to cross-use in this case. Defendants now propose an additional 35 interrogatories and 80 deposition hours per side. Plaintiff respectfully submits that its proposed compromise of 30 interrogatories and 50 deposition hours is more than reasonable and sufficient for the remaining discovery needed.

**Defendants' Position:** Defendants have proposed a reasonable number of interrogatories (proposed comprise of 35) and deposition hours (80) given the number of claims and counterclaims in this case. Defendants have repeatedly explained that they do not agree the discovery from the ITC investigation is complete or relevant to all issues in this district court action. Defendants have asserted several defenses and counterclaims that will require additional discovery, such as, for example, additional interrogatories and depositions. Moreover, because Defendants expect to receive ESI from 10 custodians instead of just the three custodians from the ITC investigation, additional depositions will be needed. Plaintiff does not explain why 35 interrogatories and 80 deposition hours would be prejudicial. To the contrary, 30 interrogatories and 50 deposition hours would be prejudicial to Defendants in view of their defenses and counterclaims. Defendants, therefore, submit that 35 interrogatories and 80 deposition hours are reasonable.

Respectfully submitted,

*/s/ Karen E. Keller*

Karen E. Keller (No. 4489)

cc: Clerk of the Court (by CM/ECF & Hand Delivery)
All counsel of record (by CM/ECF and e-mail)