IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CMC MATERIALS, LLC, | ) | |
| | ) | **Redacted - Public Version** |
| Plaintiff, | ) | |
| | ) | C.A. No. 20-738-JLH |
| v. | ) | |
| | ) | ████████████ |
| DUPONT DE NEMOURS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**CMC'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE
CERTAIN OPINIONS OF MR. W. TODD SCHOETTELKOTTE,
DR. JOHN BRAVMAN, AND DR. MATTHEW LYNDE**

OF COUNSEL:
Robert L. Maier
Margaret M. Welsh
Frank Zhu
David K. Bailey
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
(212) 408 2500

Lisa M. Kattan
Katharine M. Burke
Thomas C. Martin
Erik T. Koons
Christopher Wilson
Samuel L. Kassa
Eileen Hyde
Natalie Cardenas
Daniel Ruesta
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, D.C. 20001
(202) 639-7700

Dated: June 14, 2024

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS .......................................................... 1

II.    SUMMARY OF THE ARGUMENT .......................................................................... 1

III.    MR. SCHOETTELKOTTE'S UNSUPPORTED OPINIONS REGARDING THE PROPER REASONABLE ROYALTY RATE SHOULD BE EXCLUDED................................ 1

    A.   Background of Opinions ......................................................................... 2

    B.   Legal Standard ...................................................................................... 3

    C.   Argument ............................................................................................... 4

IV.    CERTAIN OF DR. BRAVMAN'S OPINIONS SHOULD BE EXCLUDED ................... 6

    A.   Background of Opinions ......................................................................... 6

    B.   Dr. Bravman Should Be Precluded from Offering Improper Opinions on Matters Related to Intent, Mental State, and Motive ................................................................ 7

    C.   Dr. Bravman Should Be Precluded from Offering Improper Opinions on Matters Related to Antitrust Laws and Commercial Activity .............................................................. 8

        1.   Dr. Bravman's conclusions regarding compliance with antitrust laws are improper and should be excluded ........................................................................... 8

        2.   Dr. Bravman's conclusions regarding "commercial" sales and contracts should be excluded ............................................................................................. 10

V.    DR. LYNDE'S OPINIONS SHOULD BE EXCLUDED ............................................. 13

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astrazeneca UK Ltd. V. Watson Labs., Inc. (NV)*,
  No. 10-915-LPS, 2012 WL 5900686 (D. Del. Nov. 14, 2012)............................................7, 8

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)........................................................................................................15

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
  430 F. Supp. 2d 346 (D. Del. 2006)................................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..............................................................................................1, 2, 6, 10

*Dow Chem. Can., Inc. v. HRD Corp.*,
  656 F. Supp. 2d 427 (D. Del. 2009)................................................................................10

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000)............................................................................................10

*Ely v. Cabot Oil & Gas Corp.*,
  C.A. 3:09-cv-2284, 2016 WL 4169220 (D. Del. Feb. 17, 2016)............................................15

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)....................................................................................3, 4, 5

*Foods, LLC v. Hamilton Beach Brands, Inc.*,
  No. CV 16-41-CFC, 2019 WL 1578259 (D. Del. Apr. 11, 2019) ........................................10

*Guardant Health, Inc. v. Found. Med., Inc.*,
  No. CV 17-1616-LPS-CJB, 2020 WL 2461551 (D. Del. May 7, 2020) ..................................4

*Heller v. Shaw Industries, Inc.*,
  167 F.3d 146 (3d Cir. 1999)............................................................................................14

*Oxford Gene Tech., Ltd. V. Mergen Ltd.*,
  345 F. Supp. 2d 431 (D. Del. 2004)..................................................................................7

*TASER Int'l, Inc. v. Karbon Arms, LLC*,
  No. CV 11-426-RGA, 2013 WL 6773663 (D. Del. Dec. 19, 2013) ....................................4, 5

*Victaulic Co. v. ASC Engineered Sols., LLC*,
  No. CV 20-887-GBW, 2022 WL 17250376 (D. Del. Nov. 28, 2022)........................10, 11, 12

*Wirtgen Am., Inc. v. Caterpillar, Inc.*,
   No. 11:7-cv-00770-JDW-MPT, 2024 WL 166833 (D. Del. Jan. 16, 2024) ............................7

**Other Authorities**

Fed. R. Evid. 702 .................................................................................................................1, 10

**TABLE OF EXHIBITS**[1]

| Exhibit | Description |
|---|---|
| 1 | Schoettelkotte Rebuttal Report |
| 2 | Schoettelkotte District of Delaware Deposition Transcript |
| 3 | Bravman Opening Report |
| 4 | Bravman Rebuttal Report |
| 5 | Bravman Reply Report |
| 6 | Bravman District of Delaware Deposition Transcript |
| 35 | DUPONT1204_00016194 |
| 40 | Lynde Opening Report |
| 41 | Lynde Reply Report |
| 42 | Lynde District of Delaware Deposition Transcript |

---

[1] Numbered Exhibits are attached to the Appendix in Support of CMC's Motions for Summary Judgment and *Daubert* Motions filed contemporaneously herewith. Citations are to the page number of the original exhibit.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

CMC incorporates by reference its statement regarding the nature and stage of the proceedings from CMC's Opening Brief in support of its Motions for Summary Judgment.

## II.    SUMMARY OF THE ARGUMENT

Expert witnesses must be qualified, and their testimony must help the trier of fact, be based on sufficient facts or data, and be the product of reliable principles and methods that are reliably applied to the facts of the case. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993). DuPont's experts opine on numerous issues that require the Court to exercise its gatekeeping function. **First**, Mr. Schoettelkotte's royalty range of "25% to 35%" is not the product of any reliable scientific method—there is no calculation in Mr. Schoettelkotte's report showing how he came up with 25% or 35%. **Second**, Dr. Bravman's opinions relating to (1) the intent, motive, or state of mind of CMC and the inventors is outside the province of expert testimony; and (2) commercial and competitive relationships or transactions are outside of Dr. Bravman's areas of special expertise and therefore not helpful to the jury. **Third**, Dr. Lynde admits that his opinions regarding foreclosure are supported by no objective evidence or investigation. Each of these opinions should be excluded.

## III.    MR. SCHOETTELKOTTE'S UNSUPPORTED OPINIONS REGARDING THE PROPER REASONABLE ROYALTY RATE SHOULD BE EXCLUDED

CMC seeks to exclude testimony relating to Mr. Schoettelkotte's opinions in paragraphs 105 to 112 of his report that ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 1 (Schoettelkotte Report) ¶¶ 105–112.[2]  Mr. Schoettelkotte's royalty range of "25% to 35%" is not

---

[2] Mr. Schoettelkotte uses "DuPont" to collectively refer to Defendants Rohm and Haas Electronic Materials CMP Asia Inc. (d/b/a Rohm and Haas Electronic Materials CMP Asia Inc., Taiwan

the product of any reliable scientific method—there is no calculation in Mr. Schoettelkotte's report showing how he came up with 25% or 35%. Mr. Schoettelkotte cannot pick numbers out of thin air and declare them consistent with the facts of the case. *Daubert*, 509 U.S. at 589-91.

## A. Background of Opinions

DuPont retained Mr. Schoettelkotte to respond to the opinions of CMC's damages expert (Mr. Rick Eichmann), and to offer an affirmative opinion about the amount of damages that would be owed for infringing CMC's '721 Patent. Ex. 1 ¶ 6; Ex. 2 at 6:23–7:3. While Mr. Eichmann presents potential damages numbers under either a lost profits or a reasonable royalty structure, Mr. Schoettelkotte's only affirmative damages calculation is for a reasonable royalty. *See* Ex. 1 ¶ 112; *see also* Ex. 2 at 27:11–28:8, 137:15–18. To generate a proposed reasonable royalty, Mr. Schoettelkotte applies a 25% to 35% royalty rate range to the accused sales, concluding that damages should be in the range of ██████████████. Ex. 1 ¶ 112.

Mr. Schoettelkotte addresses his proposed affirmative opinion at the conclusion of his report, after criticizing Mr. Eichmann's analysis and discussing the *Georgia-Pacific* factors. Ex. 1 ¶¶ 104–112. Specifically, Mr. Schoettelkotte devotes four paragraphs to the "Reasonable Royalty Structure" (*id.* ¶¶ 105–108) and four additional paragraphs to the "Reasonable Royalty Determination" (*id.* ¶¶ 109–112). Under the "Reasonable Royalty Structure" heading, Mr. Schoettelkotte addresses whether DuPont would pay CMC a "lump sum" or a "running royalty" in exchange for a license to the '721 Patent. *Id.* ¶¶ 106–107. Here, Mr. Schoettelkotte concludes that the parties would elect a running royalty because ████████████████████████████ ███████████████████████████████████████████████████

---

Branch (U.S.A.)); Rohm and Haas Electronic Materials Asia-Pacific Co. Ltd.; Rohm and Haas Electronic Materials K.K.; and Rohm and Haas Electronic Materials LLC, and his opinions are presented collectively for "Dupont." *See* Ex. 1 ¶ 1; Ex. 2 (Schoettelkotte Dep. Tr.) at 8:15–23.

████ *Id.* ¶ 106. Then, under the "Reasonable Royalty Determination" heading, Mr. Schoettelkotte describes facts that he contends are relevant, including a high-level reference to Mr. Schoettelkotte's prior assessment of the *Georgia-Pacific* factors. *Id.* ¶ 111. In this context, Mr. Schoettelkotte agrees with Mr. Eichmann that, "██████████████████████████ ██████████████ but Mr. Schoettelkotte does not quantify how this would impact his proposed reasonable royalty. *Id.* Lastly, in the final paragraph of the "Reasonable Royalty Determination" section, Mr. Schoettelkotte introduces his 25% to 35% royalty. *Id.* ¶ 112.

Mr. Schoettelkotte's report does not include any calculation deriving a 25% to 35% royalty range. Instead, he simply states these numbers as his opinion. *Id.* ¶ 112. Then, Mr. Schoettelkotte loosely compares the 25% and 35% endpoints to various profit figures from DuPont's accused product and CMC's patent-practicing product, using ambiguous phrases like "just below" and "nearly." *Id.* For example, he notes that ████████████████████████████ ████████████████████████ and that ████████████████ ████████████████████████ *Id.* However, Mr. Schoettelkotte does not explain why these *post hoc* comparisons are meaningful, nor does he suggest that these comparisons could be used to recreate his 25% to 35% range.

## B. Legal Standard

Testimony from a damages expert in patent cases is inadmissible if it fails to "tie the relevant *Georgia–Pacific* factors to the [proposed] royalty rate or explain how [the expert] calculated a [proposed] royalty rate using these factors." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018). In *Exmark*, the Federal Circuit held that a district court abused its discretion by allowing testimony from an expert who "merely addressed the *Georgia–Pacific* factors in light of the facts and then plucked the 5% royalty rate out of nowhere." *Id.* at 1351. Even though the expert in *Exmark* discussed "quantitative

market evidence" in reaching her proposed royalty rate, the Federal Circuit was "troubled by the expert's analysis because, even assuming she properly considered this record evidence, she failed to explain how the evidence factored into the proposed royalty rate." *Id.*

Courts in this District have similarly excluded reasonable royalty opinions where there is no "showing that there is an evidentiary foundation for the particular percentage selected—i.e., for describing the methodology used to reach that number." *Guardant Health, Inc. v. Found. Med., Inc.*, No. CV 17-1616-LPS-CJB, 2020 WL 2461551, at *18 (D. Del. May 7, 2020), *report and recommendation adopted,* No. CV 17-1616-LPS-CJB, 2020 WL 5994155 (D. Del. Oct. 9, 2020); *see also TASER Int'l, Inc. v. Karbon Arms, LLC,* No. CV 11-426-RGA, 2013 WL 6773663, at *1 (D. Del. Dec. 19, 2013) (excluding as "quintessential *ipse dixit*" the opinion of an expert who "offers almost no basis as to how he arrived at his royalty rate other than that he considered the above numbers and factors.").

### C. Argument

Mr. Schoettelkotte's proposed 25% to 35% royalties are indistinguishable from the royalties excluded in *Exmark* and *TASER*. As in *Exmark*, Mr. Schoettelkotte simply proclaimed a 25%-35% royalty rate without "t[ying] the relevant *Georgia–Pacific* factors to the [25% - 35%] royalty rate or explain[ing] how [he] calculated a [25%-35%] royalty rate using these factors." *See Exmark*, 879 F.3d at 1349. Mr. Schoettelkotte "merely addressed the *Georgia–Pacific* factors in light of the facts and then plucked the [25%-35%] royalty rate out of nowhere." *Id.* at 1351. For the same reasons this was not sufficient in *Exmark*, it is not sufficient for Mr. Schoettelkotte

There are even more similarities between Mr. Schoettelkotte and the expert opinion that Judge Andrews excluded in *TASER*. 2013 WL 6773663, at *1. Both Mr. Schoettelkotte and the expert in *TASER* "offered [a] opinion on a reasonable royalty, which is based on a lower boundary, three quantitative inputs, and his application of the *Georgia Pacific* factors." *Id.* The "quantitative

inputs" used by the expert in *TASER* were the plaintiff's "lost profits as a percentage of sales," and the parties "respective R & D costs for product development" (*id.*)—Mr. Schoettelkotte's ████████████████████████████████████████████████████████ ████████████████████████████████████████████ (Ex. 1 ¶ 112). Each of Mr. Schoettelkotte and the expert in *TASER* "offers almost no basis as to how he arrived at his royalty rate other than that he considered the above numbers and factors." 2013 WL 6773663, at *1. As Judge Andrews explained in *TASER* "[t]his is the quintessential *ipse dixit* justification" and it "is not based on any reliable methodology." *Id.* Thus, just like the expert in *TASER*, Mr. Schoettelkotte's opinion should also be excluded.

Mr. Schoettelkotte's loose, *post hoc* comparisons of his 25% to 35% royalty range to the parties' profit margins do not cure Mr. Schoettelkotte's problem. What Mr. Schoettelkotte needs is a reliable methodology for *generating* the 25% to 35% royalty rates—he needs to show a measurable and testable method that results in a 25% to 35% royalty. Backing royalty numbers plucked from the air into profit figures is no substitute for his missing methodology. These comparisons are merely after the fact descriptions; Mr. Schoettelkotte still relies on *ipse dixit* to generate 25% and 35%. Moreover, the comparisons themselves are arbitrary and vague. For example, while he describes 25% as "████████ of" ██% and "██████████ of" ██%, the same is true for 24%. Nothing in paragraph 112 (or anywhere in Mr. Schoettelkotte's report) explains why Mr. Schoettelkotte decided 24% is wrong and 25% is right.

Mr. Schoettelkotte's consideration of the *Georgia-Pacific* factors also does not justify his 25% to 35% royalties. As *Exmark* and *TASER* demonstrate, invoking the *Georgia-Pacific* factors does not excuse a damages expert from presenting a reliable methodology. And at no point in his report does Mr. Schoettelkotte quantify how any of the *Georgia-Pacific* factors impact his royalty

numbers.  *See* Ex. 2 at 83:15–24 ("Q: […] [C]an you quantify for me how much of an upward impact Georgia Pacific factor 3 had?  A: […] I haven't set a figure based on that.").

Even qualitatively, it is unclear how Mr. Schoettelkotte's conclusion on the *Georgia-Pacific* factors impacted his 25% to 35% numbers.  Despite concluding that CMC would have a better bargaining position, Mr. Schoettelkotte still opines that the royalty range should be much close to DuPont's profit margins (███% to ███%) rather than CMC's profit margin (███%).  Using DuPont's ███ margins instead of CMC's ███ margin would appear to be consistent with *DuPont* having more bargaining power—the exact opposite of what Mr. Schoettelkotte concluded based on the *Georgia-Pacific* factors.  There is simply no coherent connection between Mr. Schoettelkotte's *Georgia-Pacific* analysis and his royalty range.  This *ipse dixit* approach falls short of the requirements under *Daubert* and the Court should not allow Mr. Schoettelkotte to testify to the jury about his purported royalty range of 25% to 35%.

## IV.    CERTAIN OF DR. BRAVMAN'S OPINIONS SHOULD BE EXCLUDED

CMC moves to exclude certain testimony and opinions of DuPont's technical expert, Dr. John Bravman, relating to (1) the intent, motive, or state of mind of CMC or the inventors; and (2) antitrust laws and commercial activity.  Intent, motive, and state of mind are within the province of the jury, and are not appropriate for expert testimony.  Moreover, Dr. Bravman has no special expertise to reliably opine on the commercial or competitive nature of transactions.

### A.  Background of Opinions

DuPont offers Dr. Bravman as a technical expert on issues of patent validity and infringement.  *See* Exs. 3 (Bravman Opening Report),  4 (Bravman Rebuttal Report), 5 (Bravman Reply Report).  Dr. Bravman specializes in materials science and engineering and, since 1985, has been a professor in those disciplines.  *See* Ex. 3 ¶¶ 11-20. His publications are all technical in nature, as are the courses he teaches and the professional societies in which he is involved.  *Id.*

¶¶ 17-19. He describes his areas of expertise as "[i]ntegrated circuit process technology" and related areas. Ex. 3 at Ex. 1, p.1. Neither his reports nor his resume refers to any special knowledge in the areas of assessing intent, or in antitrust laws or commercial activity.

**B. Dr. Bravman Should Be Precluded from Offering Improper Opinions on Matters Related to Intent, Mental State, and Motive**

Expert witnesses are not "permitted to testify . . . regarding []intent, motive, or state of mind, or evidence by which such state of mind may be inferred." *Oxford Gene Tech., Ltd. V. Mergen Ltd.*, 345 F. Supp. 2d 431, 443 (D. Del. 2004). Accordingly, courts frequently exclude expert testimony about what inventors or a party "knew or intended." *Astrazeneca UK Ltd. V. Watson Labs., Inc. (NV)*, No. 10-915-LPS, 2012 WL 5900686, *2 (D. Del. Nov. 14, 2012); *see also Wirtgen Am., Inc. v. Caterpillar, Inc.*, No. 11:7-cv-00770-JDW-MPT, 2024 WL 166833, at *2 (D. Del. Jan. 16, 2024) (finding that an expert "has no knowledge about Caterpillar's subjective state of mind, nor can an expert offer an opinion about a party's subjective state of mind").

Dr. Bravman's opinions relating to alleged inequitable conduct and alleged improper inventorship repeatedly cross the line of permissible testimony. Dr. Bravman frequently opines regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Ex. 3 ¶¶ 867, 868, 871, 873-886, 893, 898-899; Ex. 5 ¶¶ 995, 998, 1003, 1010, 1012, 1014, 1016, 1021, 1026, 1028, 1031, 1033. And he repeatedly asserts that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ *E.g.*, Ex. 3 ¶¶ 887-889; *see also* Ex. 4 ¶¶ 47 (▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮), 205 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 3 ¶ 884 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



); Ex. 5 ¶ 420 ( ).

Dr. Bravman also concludes that the inventors knew about others who contributed to the invention but intentionally omitted them from the patent application. ████ ██████ Ex. 4 ¶¶ 131, 135, and ██████ Ex. 3 ¶ 840; Ex. 5 ¶ 981. He speculates about ████ ██████ Ex. 3 ¶¶ 261, 267. He even relies on accusations ████ ██████ Ex. 5 ¶ 313.

To be clear, the inventors, CMC employees, and third parties Dr. Bravman points to did not testify that they had the state of mind that he presumes. Rather, Dr. Bravman concludes that they had specific knowledge and specific intent based on nothing more than his own impressions. As such, his opinions fall squarely into the category of impermissible state of mind testimony. *Astrazeneca*, 2012 WL 5900686, *2 (striking testimony "opining on what the inventors of the '314 patent 'knew' and 'considered' regarding the disclosure of zinc in the prior art").

CMC therefore requests that the Court exclude the opinions at Ex. 3 ¶¶ 261, 267, 840, 867, 868, 871, 873-886, 887-889, 893, 898-899; Ex. 4 ¶¶ 47, 131, 135, 205; and Ex. 5 ¶¶ 313, 420, 995, 998, 1003, 1010, 1012, 1014, 1016, 1021, 1026, 1028, 1031, 1033, and any related testimony.

### C. Dr. Bravman Should Be Precluded from Offering Improper Opinions on Matters Related to Antitrust Laws and Commercial Activity

#### 1. Dr. Bravman's conclusions regarding compliance with antitrust laws are improper and should be excluded

Despite not having any professional background in economics, competition, or markets, nor purporting to follow any methodology whatsoever for assessing compliance with federal or

state competition laws, Dr. Bravman repeatedly draws legal conclusions regarding CMC's supply contracts and whether those contracts are anticompetitive:

- █████████████████████████████████████████████████████
  █████████████████████████████████████████████████████
  ████████████████████ Ex. 4 ¶ 617.

- █████████████████████████████████████████████████████
  █████████████████████████████████████████████████ Ex. 4 ¶ 682.

- █████████████████████████████████████████████████████
  █████████████████████████████████████████████████ Ex. 4 ¶ 665.

- █████████████████████████████████████████████████████
  ████████████████████████████ Ex. 4 ¶ 617 (citing contracts).

- █████████████████████████████████████████████████████
  ███████████████████ Ex. 4 ¶ 672.

*See also, e.g.*, Ex. 4 ¶ 197 (█████████████████████████████████████
████████████), ¶ 198 (█████████████████████████████████████████████
████████████████████████████████████), ¶¶ 153-154 (describing
████████████████████████████████████), ¶ 167 (similar), ¶ 651 (describing alleged █████████
█████████████████████████████████████); Ex. 5 ¶ 1000 (███████████████
██████████████████████████████████).

Dr. Bravman even opines as to CMC's *intent* in the alleged violation of unidentified antitrust laws, concluding that CMC's Vice President ████████████████████████████████
█████████████████████████ Ex.3 ¶ 871, and thus ███████████████████████. Ex. 4 (Rebuttal Report) ¶ 562; *see also id.* ¶ 577 (similar).  Even DuPont's proffered expert in competition comes nowhere close to such unsupported allegations.  *See* CMC's MSJ No. 1 (describing DuPont's expert positions on antitrust counterclaims).

That Dr. Bravman draws these conclusions in rebuttal to CMC's evidence of secondary considerations, including CMC's commercial success and DuPont's copying of CMC's invention, does not make his opinions admissible. Dr. Bravman simply has no "'specialized knowledge' regarding the area of testimony"—here, antitrust laws—and has not followed any proper methodology in determining compliance with those laws, and his opinions and testimony are thus improper under Rule 702. *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (quoting *Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir. 1998)); *Victaulic Co. v. ASC Engineered Sols., LLC*, No. CV 20-887-GBW, 2022 WL 17250376, at *8 (D. Del. Nov. 28, 2022) ("Even if a jury needed such an expert, Swanger asserts no expertise in patent licensure or contract interpretation and, thus, could not fill that role."); *Daubert*, 509 U.S. at 589-91.

CMC thus requests that the Court exclude the opinions at Ex. 3 ¶ 871; Ex. 4 ¶¶ 153-154, 167, 197-198, 562, 577, 617, 665, 672, 682; Ex. 5 ¶¶ 339, 364, 1000, 1003, and related testimony.

### 2. Dr. Bravman's conclusions regarding "commercial" sales and contracts should be excluded

Dr. Bravman also repeatedly opines that ███████████████████████████████████████████████████████████████████████████. Ex. 3 ¶¶ 200, 235 & n.5, Exhibit 3. Here, Dr. Bravman rejects ███████████████████████████████████████████████████████████████████████████████████████████████████. Ex. 5 ¶¶ 207, 260, 286, 574, 669, 974. As Dr. Bravman has no "specialized knowledge" on these financial and legal issues, his opinions will not help a jury and should be excluded. *See, e.g.*, *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, No. CV 16-41-CFC, 2019 WL 1578259, at *1 (D. Del. Apr. 11, 2019); *see also Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 364 (D. Del. 2006) (excluding opinion about nature of the contractual obligations at issue); *Dow Chem. Can., Inc. v.*

*HRD Corp.*, 656 F. Supp. 2d 427, 435-36 (D. Del. 2009) (striking testimony on meaning of contract and parties' compliance with contract); *Victaulic*, 2022 WL 17250376, at *7-8.

Indeed, Dr. Bravman's opinions read like an attorney's argument citing documents and offering conclusions about whether particles and slurries are commercial and prior art. For example, Dr. Bravman independently reviews financial spreadsheets and non-disclosure agreements regarding slurries to conclude that, ██████████████████████████ ███████████████████████████ Ex. 3 ¶ 180 (emphasis added); *see also id.* ¶ 186 (███ ████████████████████████████████████), ¶¶ 181-188; Ex. 5 ¶ 272 (analyzing agreement). Dr. Bravman is a lifelong academic; he has no expertise in commercial issues, or in the law of prior art commercial sales. Ex. 6 (Bravman Dep. Tr.) at 11:4-15:1. Dr. Bravman performs the same legal and financial analysis for W8500 and D922x slurries. Ex. 3 ¶¶ 194-197 (████████████████████████████████████████ ████████████████); *id.* ¶¶ 167-172 (██████████████████████████████).

Likewise, for multiple unrelated particles procured over the course of years for various R&D projects, Dr. Bravman repeatedly concludes ██████████████████████████ ████████████████████████████████████████████████████████ ███████ Ex. 3 ¶¶ 153, 175, 235, based on his own conclusion about the agreements and related "discussions," *id.* ¶¶ 218-220, and his own review of forecasts, import records, emails, and contracts, *id.* ¶¶ 222-227, 229-232, 236, 238-239 (conclusions regarding BS-2H particles).

This type of unqualified opinion on economic issues is provided throughout his reports. *E.g.*, Ex. 3 ¶¶ 207-210 (█████████████████ concluding sales were commercial based on review of agreements and purported ██████████████████████ and emails between sales and procurement, not technical, employees); Ex. 3 ¶¶ 189, 279-288, 292-302 (██████████████████



); Ex. 3 ¶¶ 135, 250-260, 262-263, 266-271 (

); Ex. 4 ¶ 145 (

); Ex. 3 ¶¶ 871-872 (

), ¶ 840 (

); *see also, e.g.*, Ex. 5 ¶ 307 (

). For some particles he has no analysis at all, drawing conclusions regarding commercialization based on illogical leaps from internal emails relating to "samples," test results, purchase orders, or his own analysis of legal agreements. *E.g.*, Ex. 3 ¶¶ 244-245 (BS-3 particles), 306-307 (PL-1), 312-313 (PL-2), 317-318 (PL-2L), 322-323 (PL-3), 326-327 (PL-3L), 331-332 (███), 336-338 (PL-7), 342-343 (SH-3).

Because Dr. Bravman's conclusions are not based on any specialized knowledge, and merely serve as a conduit for facts that "should be presented through fact witnesses and/or documents" for a jury to assess, they should be excluded. *Victaulic*, 2022 WL 17250376, at *8. CMC therefore requests exclusion of Dr. Bravman's opinions relating to commercial availability and prior art status in the following: Ex. 3 ¶¶ 171-172, 175, 180-181, 183, 186-189, 194, 196-197, 200 & n.5, 208-209, 216, 218-220, 224, 228-231, 233-234, 237-238, 258, 260, 287, 301-302, 306, 760, 774 n.10, 840, 850, 868-873, 875, 884, 887-890, 893, 898-899, Exhibit 3 to the report; Ex. 4 ¶¶ 135, 145, 150, 151, 199, 590, 596, 605; Ex. 5 ¶¶ 249-250, 259-260, 263, 265-

266, 270, 273, 277-278, 285-287, 290, 292, 296, 299, 301-303, 305-311, 315-316, 318-319, 326, 329-331, 333, 340, 350, 352, 356, 358-360, 363-365, 367, 369-370, 375, 377, 379-380, 383, 394-395, 397-398, 400-401, 403-405, 407, 409, 414, 416-417, 422, 425-426, 429, 431, 434, 436-437, 439, 444-447, 456, 458, 462-463, 465-467, 469-470, 473-474, 478, 1002-1006, 1009-1012 and related testimony.

## V.    DR. LYNDE'S OPINIONS SHOULD BE EXCLUDED

CMC hereby moves to exclude Paragraphs 19, 80-81, 90-101, and 109 from the Opening Expert Report of Matthew Lynde, Ph.D. (Ex. 40) and Paragraphs 3, 23, 26, 28, 30, 32, 34, 36-46, and 48 from Dr. Lynde's Reply Expert Report of Matthew Lynde, Ph.D. (Ex. 41) (together, the "Challenged Lynde Opinions"). The Challenged Lynde Opinions purportedly support Dr. Lynde's conclusion that ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ Ex. 40 ¶ 81 (emphases added). The ████████████████████ at issue were directed to four specific types of "ultra-high purity colloidal silica particles" ("UHPCS particles")—████████ BS-2H, ████████ and ████████—made by Fuso. *Id.* ¶¶ 39, 44-45.

The Challenged Lynde Opinions should be excluded for two reasons. *First*, Dr. Lynde conceded at his deposition that CMC's ████████████████████ directed to ████████ did *not* harm competition. *See* Ex. 42 at 72:3-13 (████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████). Thus, any of Dr. Lynde's opinions relying in part on ████████, including at least Lynde Report Paragraphs 90 and 94 (directed to the length of the ████████████████ as evidence of harm), should be excluded.

*Second*, Dr. Lynde has no reliable basis for the Challenged Lynde Opinions contending that CMC's ████████████████████ directed to BS-2H, ████████, and ████████ harmed

competition because DuPont's inability to access those three particles ████████ DuPont from the relevant market. Ex. 40 ¶ 81. Dr. Lynde does not dispute that DuPont had unfettered access to other Fuso UHPCS particles while ████████████████████████████████████ ██████████. *See, e.g.*, Ex. 41 ¶¶ 36-37. Nor does he dispute that internal DuPont business documents acknowledge that i) Fuso was not the only manufacturer of UHPCS particles; and ii) DuPont had access to alternative suppliers and particles. *See, e.g., id.* ¶ 39 (███████████████ ██████████████████); Ex. 42 at 62:2-63:4 (████████████████████████████████ ██████████████████████). DuPont's access to these alternative particles render impossible Dr. Lynde's opinion that ██████████████████ foreclosed DuPont from accessing particles ██████ to make products that could compete in the alleged relevant market.

Moreover, Dr. Lynde's testimony made clear that his conclusion that there were no ████████████████ to those subject to the ████████████████ (*see* Ex. 41 ¶¶ 37-39) is unsupported by adequate investigation or economic analyses, thus rendering his opinions baseless and likely to mislead the jury. *See, e.g., Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 153 (3d Cir. 1999) (courts must determine whether expert opinions "reliably flow from the facts known to the expert and the methodology used."). For example, he did not investigate: whether there were other suppliers of UHCPS particles at the time the ████████████ at issue were ████████████ in 2013 (Ex. 42 at 60:21-61:4); whether any of the Fuso UHPCS particles that DuPont continued to acquire could have been used for products in the relevant product market (*id.* at 86:15-93:16); what research and development DuPont was conducting while the ████████████ at issue were ██████ (*id.* at 122:10-123:13); or whether DuPont's alleged "delay" in developing the Optiplane products at issue was due solely to DuPont not having access to the particles ████████████ ██████ (*id.* at 142:13-19).

Instead of investigating these relevant questions regarding the actual availability of alternative UHPCS particles, Dr. Lynde repeatedly testified that his understanding and conclusion that there were no viable alternative particles were based primarily on his interviews with two DuPont witnesses, Jia-Ni Chu and Yi Guo. *See, e.g.*, *id.* at 60:21-61:4, 70:11-19, 83:23-84:4, 94:3-95:4, 121:1-18, 122:1-9, 125:2-126:15, 158:23-159:12, 188:3-15; 195:18-196:3. But interviews with self-serving DuPont witnesses simply do not suffice to support Dr. Lynde's sweeping *economic* conclusion that CMC's ███████████ wholly "blocked DuPont's ability to obtain this ██████ nput." *See, e.g.*, *Ely v. Cabot Oil & Gas Corp.*, C.A. 3:09-cv-2284, 2016 WL 4169220 at * 10 (D. Del. Feb. 17, 2016) (expert opinion unreliable when based on "information and allegations supplied by a party where there is no other objective evidence to bolster the opinion."). This is particularly true given that the self-serving DuPont testimony is contradicted by record evidence. For example, Dr. Lynde opines that Fuso particles ████████████████████ ███████████████████████████████████, ignoring both that ███████ ██████████████████████████████ and that ████████ was one of those subject to the ██████████████ he deemed anticompetitive. *See, e.g.*, Ex. 35 at 204 (███████████ ████████); Ex. 40 at ¶ 94.

Dr. Lynde's inadequate investigation renders his opinion regarding no viable alternative UHPCS particles—and, by extension, his opinion that the ████████████████ foreclosed competition—wholly unreliable, and those opinions should therefore be excluded. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (expert opinion cannot support jury verdict if "is not supported by sufficient facts to validate it in the eyes of the law" or indisputable record facts contradict" opinion).

Respectfully submitted,

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff*

OF COUNSEL:
Robert L. Maier
Margaret M. Welsh
Frank Zhu
David K. Bailey
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
(212) 408 2500

Lisa M. Kattan
Katharine M. Burke
Thomas C. Martin
Erik T. Koons
Christopher Wilson
Samuel L. Kassa
Eileen Hyde
Natalie Cardenas
Daniel Ruesta
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, D.C. 20001
(202) 639-7700

Dated: June 14, 2024

16

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2024, this document was served on DuPont-Delaware@finnegan.com, IPservice@potteranderson.com and on the persons listed below in the manner indicated:

### BY EMAIL

David E. Moore
Bindu A. Palapura
Andrew L. Brown
POTTER ANDERSON & CORROON, LLP
Hercules Plaza
1313 N. Market St., 6th Flr.
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190
(571) 203-2700
charles.lipsey@finnegan.com

William S. Farmer
David C. Brownstein
David M. Goldstein
FARMER BROWNSTEIN JAEGER
 GOLDSTEIN KLEIN & SIEGEL LLP
235 Montgomery St., Suite 835
San Francisco, CA 94104
wfarmer@fbjgk.com
dbrownstein@fbjgk.com
dgoldstein@fbjgk.com

Mareesa A. Frederick
Eric J. Fues
Anthony A. Hartmann
Kaitlyn S. Pehrson
Hira Javed
Emily R. Gabranski
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000
mareesa.frederick@finnegan.com
eric.fues@finnegan.com
anthony.hartmann@finnegan.com
kaitlyn.pehrson@finnegan.com
hira.javed@finnegan.com
emily.gabranski@finnegan.com

17

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff*